## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SARAH LEE GOSSETT PARRISH, | ) | |
| on behalf of herself and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-15-913-HE |
| | ) | |
| ARVEST BANK, | ) | |
| a foreign corporation, | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff, Sarah Lee Gossett Parrish ("Parrish" or "Plaintiff"), on behalf of herself and all others similarly situated, for her Second Amended Class Action Complaint, alleges and states as follows:

## I.      PARTIES, JURISDICTION, AND VENUE

1.      Parrish is a citizen and resident of the state of Oklahoma.  Parrish has been a customer of Defendant Arvest Bank ("Arvest") since at least 1997.  Since that time, Parrish has maintained business checking accounts, money market accounts, and personal banking accounts at Arvest.  Parrish currently has five active accounts at Arvest.

2.      The Court has diversity jurisdiction over this matter because Arvest is a foreign corporation which is incorporated and has its principal place of business outside of Oklahoma, though Arvest conducts business in and has sufficient minimum contacts with the state of Oklahoma for this Court to have personal jurisdiction over it.  Arvest is an Arkansas-chartered bank with over 270 locations that are part of 16 locally managed banks

in more than 120 communities throughout Arkansas, Kansas, Missouri, and Oklahoma.[1]

There are approximately 134 Arvest locations in Oklahoma.[2]

    3.      Venue is proper in the Western District of Oklahoma pursuant to 21 U.S.C.

§ 1391 because a substantial part of the events and omissions giving rise to the claims

occurred in the Western District of Oklahoma, and Arvest is subject to personal jurisdiction

in the Western District of Oklahoma.

## II.    CLASS ALLEGATIONS

    4.      Plaintiff brings this action on behalf of herself and all others similarly

situated, pursuant to Federal Rule of Civil Procedure 23. This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority

requirements of Rule 23.

    5.      Plaintiff proposes the following class (the "Class"), defined as:

> All Arvest customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an insufficient funds (NSF) fee or overdraft (OD) fee (collectively, "NSF/OD Fee") as a result of Arvest's practices of failing to reflect an accurate balance of funds on Arvest's online and/or mobile banking platforms; failing to provide account statements from which a customer can determine the order in which transactions and deposits were actually received and processed; assessing NSF/OD Fees at times when the customer agreement did not provide for such a fee; assessing NSF/OD Fees for transactions that should not have been authorized; re-sequencing credit and debit transactions such that transactions are posted to a customer's account in a non-chronological order resulting in additional NSF/OD Fees than would otherwise be charged if the transactions were posted in a chronological

---

[1] https://www.arvest.com/about/history, accessed August 21, 2015.

[2] https://www.arvest.com/pdfs/about/oklahoma-locations.pdf, accessed August 21, 2015.

order; failing to instantly credit an account with a transfer of funds from another Arvest account; misrepresenting Arvest's internal policies and procedures regarding the posting order of transactions; and failing to properly disclose all material facts regarding Arvest's internal policies and procedures regarding the posting order of transactions.

6.      Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

7.      Excluded from the Class are: Arvest; its parents, subsidiaries, affiliates, officers, and directors; any entity in which Arvest has a controlling interest; all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

8.      The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of which is within the knowledge of, and can be ascertained only by resort to, Arvest's records.

9.      The claims of the representative Plaintiff are typical of the claims of the Class. Plaintiff, like all other members of the Class, was improperly charged NSF/OD Fees by Arvest as a result of its improper practices. The factual basis of Arvest's misconduct is common to members of the Class and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

10.      There are numerous questions of fact and law common to the Class, and those questions predominate over any questions affecting only individual Class members.

11.     Among the questions of law and fact common to the Class are whether Arvest:

    a.    Assessed NSF/OD Fees for ATM/CheckCard transactions, automated clearinghouse transactions, point-of-sale debit card transactions, pre-authorized automatic debits, telephone-initiated funds transfers, online banking transactions and other transactions at times when the customer agreement did not provide for such fees;

    b.    Failed to obtain affirmative consent from its customers prior to processing transactions it knew would result in NSF/OD Fees;

    c.    Manipulated and reordered transactions so it could increase the number of NSF/OD Fees it imposed;

    d.    Breached its form contracts through its overdraft practices;

    e.    Breached its fiduciary duty to its customers through its overdraft practices;

    f.    Unjustly obtained money belonging to its customers through its overdraft practices and was, therefore, unjustly enriched;

    g.    Made false, incomplete, or misleading statements regarding account balances causing its customers to overdraw their accounts or initiate transactions for which the account does not have sufficient funds;

    h.    Made false, incomplete, or misleading statements regarding the time at which deposits and/or intra-bank account-to-account transfers are

authorized and posted causing its customers to overdraw or initiate transactions for which the account does not have sufficient funds;

i.  Made false, incomplete, or misleading statements about Arvest's internal policies and procedures regarding the posting order of transactions;

j.  Made false, incomplete, or misleading statements through advertisements, informational videos, and other promotional information available to its customers representing that mobile deposits and/or transfers were reliable and that account balances available through mobile banking tools provide accurate and up-to-date information;

k.  The proper method or methods by which to measure damages.

12. Plaintiff is committed to the prosecution of this action and has retained competent counsel experienced in class action litigation. Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

13. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small, relative to the complexity of the litigation, and due to the financial resources of Arvest, no Class member could afford to seek legal redress individually. Absent a class action, the Class members will continue to suffer financial losses, and Arvest's misconduct and resulting unjust enrichment will proceed without remedy.

14.     Even if Class members themselves could afford such individual litigation, the court system could not.   Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.   Individualized litigation would also create the potential for inconsistent or contradictory rulings.   A class action presents fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

### III.     COMMON FACTUAL ALLEGATIONS

**A.     Arvest's Electronic Banking Services**

15.     Arvest provides checking account customers with ATM/CheckCards.   With these cards, customers can make point-of-sale ("POS") transactions, which are widely accepted by merchants across the country and the world.   With these cards, customers can also make ATM cash withdrawals at ATMs across the country and across the world.   Arvest becomes immediately aware of these transactions.   Arvest does not immediately complete these transactions in the order in which they are received.

16.     Arvest provides customers with multiple Arvest bank accounts the ability to make intra-bank transfers – from one Arvest account to another – by making an in-person transfer at an Arvest Banking center, by telephone, on www.arvest.com, or through its mobile banking technologies, including by SMS text message.   Arvest is continually aware of the balance of both Arvest accounts which are part of these intra-bank transfers.   Arvest transfers the funds instantly, regardless of whether the transaction is performed in-person

or remotely.  Arvest shows the funds as immediately available on the customer's balance, which the customer can confirm in-person after the transfer, or can access on www.arvest.com or through Arvest's mobile banking technologies, including instantaneous text message confirmations of the same.

17.     Arvest provides customers the ability to instantly transfer funds to and from accounts at other financial institutions and provides customers the ability to receive or pay instant automatic deposits or debits to or from Arvest accounts through automated clearinghouse ("ACH") transactions.

18.     Arvest uses internal and third-party software programs designed to extract the greatest possible number of NSF/OD Fees from its customers by re-ordering and manipulating the posting order of account transactions, rather than allowing them to post in chronological order.

19.     For example, in a given day, Arvest will wait to post all customer transactions at one time at the end of the day, at 11:59 p.m., which is accomplished by "batch" processing the transactions by transaction type.  Thus, all POS transactions will be processed and posted in one "batch" before other types of debit transactions are posted regardless of whether those other transactions were initiated by the customer and authorized by Arvest prior to one or more of the POS transactions.  Next, all check transactions are processed and posted in one "batch," followed by all ACH transactions and other types of transactions until all transactions are posted.  Arvest specifically designed its banking software to achieve this nefarious goal by which it is unjustly enriched.

7

20.     Contrary to standard banking practices, Arvest deliberately sequences the batches of transaction types in a manner that maximizes NSF/OD Fees charged to customer accounts.  For example, Arvest processes and posts check transactions prior to posting and processing ACH transactions.  According to a recent study conducted by the Consumer Financial Protection Bureau ("CFPB"), check transactions have a higher median transaction value than ACH transactions.  Thus, Arvest's decision to post check transactions before all ACH transactions effectively results in larger transactions being posted prior to smaller transactions.  Because all check transactions are processed before all ACH debits, members of the Class, including Parrish, incurred NSF/OD Fees, which they would not have incurred had they been informed of the posting order or had the posting order been chronological.

21.     Additionally, transactions of the same type are not processed and posted in chronological order within the "batch" process such that a larger POS transaction that occurred at the end of the business day may be processed and posted to the account prior to a smaller POS transaction that occurred earlier in the day.

22.     Arvest's internal bookkeeping practices result in customers being charged substantially more in NSF/OD Fees than if their transactions had been posted in the order in which they were initiated by the customer and authorized by the Bank.

23.     Arvest does not notify its customers that it posts transactions in non-chronological order, nor does it otherwise disclose its practice of batch processing to its customers.  In fact, Arvest's form agreements and marketing materials are designed to lead its customers to believe that transactions are posted in the order in which they are initiated.

8

24.    For example, upon becoming a customer with Arvest, each customer submits to an Electronic Fund Transfers Agreement and Disclosure (the "EFT Agreement"),[3] which states that "[p]urchases made with your CheckCard, including any purchase where you receive cash, are referred to as 'Point-of-Sale' transactions and will cause your 'designated account' to be debited for the amount of the purchase." (Exhibit 1, EFT Agreement at 1.) The EFT Agreement goes on to state "**Each time** you use your CheckCard, the amount of the transaction will be debited from your designated account." (*Id*. at 2) (emphasis added). Because CheckCard transactions are to be debited "each time" the CheckCard is used pursuant to the EFT Agreement, a transaction that occurred at 10:00 a.m. should be debited from the designated account before a transaction that occurred at 2:00 p.m. on that same business day.  Arvest's practice of re-ordering transactions in a manner that does not reflect the actual date and time the transaction was initiated by the customer and authorized by the Bank is inconsistent with these descriptions of the debit order of CheckCard transactions and is contrary to standard banking practices.

25.    Moreover, in one instructional pamphlet entitled "How to Keep Good Bank Records" available to Arvest customers through the Arvest website,[4] Arvest advises its customers that the best method to maintain a record of transactions and up-to-date and accurate balance information is to "enter every transaction as soon as possible."  Although this same document advises Arvest customers that "Check numbers do not always clear in

---

[3] The EFT Agreement is attached as Exhibit 1.
[4]    *See, e.g.*,   https://www.arvest.com/pdfs/personal/check-balance-tips.pdf,   accessed November 9, 2015.

numerical order or immediately," there is no disclosure or notification that other transactions, including ATM/CheckCard, POS, ACH, online transfers and other transactions, will not be posted in the order in which they are initiated and authorized by the Bank. Further, even if customers immediately record transactions in their own personal records, the balance reflected on their records at the end of the day often differs from the actual balance reflected in Arvest's records due to the manner in which Arvest reorders and batch processes transactions. As a result, customers relying on Arvest's false representations that accurate balances can be calculated in the methods described in the instructional pamphlet entitled "How to Keep Good Bank Records" are misled and harmed because the balances calculated in this method are not the same as the balances calculated in Arvest's method. Customers are thus unable to determine, prior to initiating and completing a transaction, whether that particular transaction will result in the imposition of NSF/OD Fees.

26.     Parrish in fact balanced her checkbook. On multiple occasions, when her checkbook reflected a positive balance, she was charged one or more NSF/OD Fees because, as a result of its reordering and batch processing of transactions, Arvest reflected a negative balance. On other occasions, according to Parrish's records, her account should have been assessed one NSF/OD Fee, but Arvest instead assessed two or three based on its manner of reordering and batch processing.

27.     Given the method and manner of Arvest's batch processing, a customer's immediate recording of transactions is neither self-evidently accurate nor does it result in the avoidance of fees. Arvest's overdraft fees are a product of its computer software that

has been intentionally designed to unjustly enrich Arvest by batch processing transactions in an order that results in the greatest number of NSF/OD Fees possible, which making it impossible for a customer to ascertain the order in which transactions were processed, and while rendering a customer's efforts to avoid NSF/OD Fees (by recording their transactions in the order in which they occur) absolutely futile.  Arvest does not advise its customers of this scheme or of its computer software that Arvest, in derogation of standard banking practices, has designed to extract the maximum amount of NSF/OD Fees from each customer.   Thus, Arvest's NSF/OD Fees are attained through its method of batch processing, and cannot be prevented merely by the customer's recording of transactions. Parrish, as Arvest's customer, was led to believe that recording of transactions avoids overdraft fees, when in truth and in fact it does not because Arvest's batch processing reorders transactions in a fashion to increase fees.

28.     As a result of the manner in which Arvest batch processes transactions, the representations it provides to its customers through the EFT Agreement and the instructional pamphlet entitled "How to Keep Good Bank Records" are false and mislead Arvest's customers to believe a different method is employed.

29.     The method actually employed by Arvest, which is not disclosed to its customers, has the effect of increasing the number of NSF/OD Fees that Arvest is able to charge.  One such instance is reflected in the July 17, 2012 bank statement for Parrish's account ending in 4332.  The statement reflects that on July 3, 2012, five NSF/OD Fees were assessed against the account as a result of transactions occurring on July 2, 2012.  The beginning balance in the account on July 2, 2012 was $10,925.87.  Eleven transactions

were presented and batched together for ordering and processing on July 2, 2012 at 11:59 p.m.  Based on Arvest's order of processing, two POS transactions were processed first, followed by a transfer from the account.  This left a positive balance of $1,820.65.  Six checks were then presented for processing.  The third and fourth checks created negative balances, but were nevertheless processed and posted because they did not exceed the $1,000 overdraft protection limit.  Two NSF/OD Fees were incurred for these checks.  The fifth check for $1,000 was not posted, but was instead placed in queue for "exception processing" for the bank to consider the following day.  Another NSF/OD Fee was incurred for this check.  The sixth check for $278.90 was then posted to the account, for which a fourth NSF/OD Fee was assessed.  Arvest then processed two ACH transactions for $260.00 and $535.03.  Both were sent to "exception processing" and both incurred NSF/OD fees.  Ultimately, five NSF/OD fees were charged to Parrish's account for the activity occurring on July 2, 2012 (the first fee was forgiven by Arvest, according to its stated policy).  Had Arvest employed a different posting method and instead posted ACH transactions prior to check transactions, this same activity would have resulted in the imposition of only three NSF/OD Fees, not five.  If Arvest employed a low-to-high posting method, only one NSF/OD Fee would have been incurred, although it would have been forgiven based on Arvest's policy.

30.     On the morning of July 3, 2012, when "exception processing" was occurring with respect to the transactions listed in Paragraph 29, Arvest received two transfers exceeding the total amount of the three transactions sent to "exception processing."  Since the batch processing occurred at 11:59 p.m. on the night of July 2, 2012, Parrish was

unaware of the account balance that Arvest's computer system registered, which differed significantly from the account balance calculated by Parrish from her receipts and records of July 2, 2012.  The balance reflected by Arvest's system was the result of its software program that is engineered to achieve the greatest possible NSF/OD Fees.  Parrish did what every other banking customer does: she calculated her actual balance by subtracting her daily transactions in the order in which she transacted them.  Upon awakening on July 3, 2012 and checking her online account balance, Parrish was surprised to see numerous NSF/OD Fees and immediately made these two transfers, which exceeded the amount of the three transactions Arvest had sent to "exception processing" overnight.  These two morning transfers by Parrish were both received before the deadline for completion of "exception processing," but, to Parrish's detriment and Arvest's unjust enrichment, Arvest elected to ignore these transfers and instead imposed fees.  Had Arvest posted these transfers to Parrish's account, no more than one or two NSF/OD Fees would have been assessed.  Significantly, had Arvest exercised its contractual right to transfer funds from one Arvest account to another, which it is authorized to do in order to avoid fees when customers have multiple Arvest accounts, then no NSF/OD Fees would have been incurred.

31.    The information Arvest provides to its customers fails to disclose even the most basic information about Arvest's posting order and bookkeeping practices, making it impossible to determine with any degree of certainty which transactions might generate negative balances and incur NSF/OD Fees.  Arvest fails to disclose to its customers that it reorders and batch processes transactions.  These omissions render the statements

contained in the EFT Agreement and Arvest's other promotional and marketing materials false and misleading.

**B.     Arvest's Online and Mobile Banking Tools**

32.     Arvest provides extensive online banking tools to its customers, upon which its customers more increasingly rely.  Arvest has an interactive website where customers can transfer money; view their balance and transaction history; pay bills; locate nearby branches and ATMs; and make intra-bank transfers between Arvest accounts.

33.     Arvest gives customers the ability to perform all these functions (including intra-bank transfers) through SMS text messaging.

34.     Arvest has an application available on Apple and Android mobile devices, giving customers these same tools, as well as giving customers the ability to remotely deposit checks by taking a picture of a check with a mobile phone and submitting it to the Bank through the Arvest mobile phone application. The Arvest mobile phone application has been downloaded on Android devices between 100,000 and 500,000 times.[5]

35.     In its promotional and informational material available to the public regarding these online and mobile banking tools, Arvest represents that the online and mobile banking tools are safe, convenient, and easy.[6]

---

[5]   https://play.google.com/store/apps/details?id=com.arvest.androidapp&hl=en,   accessed August 21, 2015.

[6] *See*, *e.g.*, https://www.arvest.com/personal/bank/online, accessed August 21, 2015.

36.     Arvest does not instantaneously process intra-bank transfers, even when it represents that it has done so, and even when standard banking practices provide that this be accomplished.

37.     Arvest constantly posts balances accessed by its customers on its online and mobile banking platforms that are inaccurate and unreliable.  Arvest's online and mobile banking platforms do not provide customers with both their balance and available balance, as is standard banking practice.  Instead, Arvest provides only one balance without indicating whether or not it is the customer's available balance.  In addition, the balance provided is false due to the manner in which Arvest processes transactions.

38.     Parrish relied on the inaccurate balances reflected by Arvest's online and mobile banking platforms before effecting transactions.  She initiated and completed transactions based on what she believed, from Arvest's misrepresentations, to be real-time account balances that she viewed on Arvest's online and mobile banking platforms.  In fact, these were not real-time balances at all and, as a result, Parrish incurred one or more unexpected NSF/OD Fees.

39.     For example, on July 8, 2015, Parrish mistakenly wrote a check from her bank account ending in 9398, believing she had done so from a different account.  When she realized her error over the weekend, Parrish checked the balance reflected on Arvest's online banking system.  It reflected that the check had not processed and there were sufficient funds in the account.  Parrish relied on this representation, which ultimately proved to be false, and waited until the following Monday morning to deposit additional funds in the account.  On Monday, July 13, 2015, Arvest's online banking system indicated

that Arvest had in fact processed and posted the check prior to Parrish's deposit, contrary to the representation upon which Parrish relied over the weekend.  As a result of this reliance, Parrish incurred an unexpected NSF/OD Fee.

**C.**     **Arvest's ATM/CheckCard and Online and Mobile Banking Agreement**

40.     Arvest's EFT Agreement states that Arvest may decline to process transactions that would cause a customer to overdraw.  The Agreement further states that Arvest may, at its discretion, charge other accounts in order to complete the transaction.

41.     The EFT Agreement states that customers will be liable for overdraft fees when Arvest processes a transaction that causes a customer's account to be overdrawn.

42.     When Arvest elects to decline to process transactions upon receipt and holds them to process in batches, or declines to charge other accounts to complete the transaction, it increases the amount of fees it can charge and collect from its customers.

43.     The EFT Agreement also states customers may rely upon online and mobile banking to check Arvest account balances, to check the credits and debits that have posted to customers' accounts, to make instantaneous transfers between Arvest accounts, and to make payments on Arvest loans.

44.     Despite the terms of its own form contracts, Arvest has intentionally authorized and continues to intentionally authorize ATM/CheckCard transactions, even when the transaction is not covered by the customer's balance of funds, and/or even when the customer has not elected to carry overdraft coverage.  By doing this, Arvest is able to assess overdraft fees, even at times when Arvest's contracts did not allow for the

assessment of such fees on ATM/CheckCard transactions, and at times when Arvest's customers did not select or want overdraft coverage.  This unjustly enriches Arvest.

45.    Arvest employs a software system to automate its overdraft system, which Arvest has redesigned, contrary to standard banking practices, to maximize the number of NSF/OD Fees by not immediately applying credits (whether they are in the form of cash deposits, check deposits, or transfers from other accounts) and by re-sequencing debit transactions such that transactions are posted to a customer's account in a non-chronological order resulting in additional NSF/OD Fees than would otherwise be charged if the transactions were posted in a chronological order.

46.    Upon information and belief, the portion of Arvest's net income attributable to the imposition of NSF/OD Fees is disproportionately higher than other, larger banks. Arvest is able to charge additional and unnecessary NSF/OD Fees by reordering and batch processing transactions in a manner that is not disclosed to its customers and that is contrary to the express representations contained in the EFT Agreement and other promotional and marketing material Arvest provides to its customers.  Of the roughly 600 banks in Arvest's peer group (those with assets over $1 billion), the substantial majority (75%) reported that NSF/OD Fees represented less than 15% of the institution's annual net income for the year ending December 31, 2015.  (*See* Variation in Bank Overdraft Revenues and Contribution, prepared by Consumer Financial Protection Bureau and available at http://files.consumerfinance.gov/f/201602_cfpb_variation-in-bank-overdraft-revenues-and-contribution.pdf).  Arvest falls well outside of this group, and earns a substantially higher portion of its net income from NSF/OD Fees on deposit accounts.  In fact, contrary

to the written agreements and marketing materials discussed above, which lead Arvest customers to believe that NSF/OD Fees are reasonable and customary charges for the benefit of "overdraft protection," the collection of NSF/OD Fees is a primary revenue driver for Arvest.  According to Arvest's own financial reports (available online through the Federal Financial Institution Examination Council), over the 18-month period between January 1, 2015 and June 30, 2016, the amount of NSF/OD Fees collected by Arvest actually *exceeds* its income.

## IV.  CLAIMS

### Count 1: Fraud (Actual)

47.     Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 46 above.

48.     Arvest stated to its customers that it would only apply NSF/OD Fees when a customer overdrew his or her account and had insufficient funds in his or her account to cover transactions made by the customers.  Arvest did not advise its customers that it utilizes a specially designed software program that maximizes the number of NSF/OD Fees that can be charged to a customer by "batch processing" all of the transactions for a particular day at 11:59 p.m. on the day of the transactions (with the exception of weekends, where transactions from 8:00 p.m. Friday through Sunday evening are batch processed at 11:59 p.m. Sunday), making it impossible for the average customer to ascertain the order in which each transaction will be, and actually was, processed by Arvest.

49.     Plaintiff and the Class relied, to their detriment, upon Arvest's fraudulent statements.  Namely, Plaintiff and the Class relied upon the balances provided to them by

Arvest (both monthly paper statements, from which it is impossible to ascertain the order in which each transaction was processed by Arvest, and real time account balances, accessed through Arvest's online and mobile banking platforms) and confirmation messages received after making deposits, representing that a deposit had actually been deposited in the customer's account when, in fact, Arvest had yet to actually credit the account with the deposit (either through a receipt given in-person, through an updated balance on Arvest's online and mobile platforms, or through a confirmation text message), among other statements, before effecting transactions.   Such balances provided to customers represent affirmative, false representations by Arvest as to the funds contained in a customer's account at a particular date and time.

50.    Customers received or viewed these balances provided to them by Arvest and then chose to initiate and complete new transactions, including but not limited to withdrawing funds from their accounts, which caused them to incur unexpected and unjust NSF/OD Fees and other related service charges as a result of these fraudulent balances.

51.    Arvest knew the instant account balances it provided (and continues to provide) to its customers were inaccurate, that its customers would detrimentally rely on these false account balances, and that, as a result, many of its customers would overdraw their accounts.

52.    Arvest's EFT Agreement states that CheckCard transactions are debited from the account "each time" the card is used.  This is a false statement.  While it may or may not imply that the posting will be instantaneous, it clearly does imply that transactions will be debited in the order in which they occur.  Otherwise, the word "each" would be

superfluous.  In fact, these transactions are not debited until the end of the business day, at 11:59 p.m., and are "batch" processed and often posted to the customer's account in non-chronological order.  The EFT Agreement also states customers may rely upon online and mobile banking to check Arvest account balances, to check the credits and debits that have posted to customers' accounts, to make instantaneous transfers between Arvest accounts, and to make payments on Arvest loans.

53.    Arvest provides marketing, promotional and other written materials to its customers which state that the best method to maintain accurate balance information is to "immediately" record each transaction, although this method is not the method used by Arvest to post transactions to the customer's account.  Significantly, this method also will not result in the same balance after accounting for the additional NSF/OD Fees charged by Arvest as a result of its bookkeeping practices.  Arvest's deviation from standard banking practices renders its customers' efforts, including Parrish, to avoid NSF/OD Fees, futile.

54.    The false and misleading statements made by Arvest to each of its checking account customers constitute fraud, and Plaintiff and the Class have suffered actual damages as a direct and proximate result of these false and misleading statements.

## Count 2: Fraud (Constructive)

55.    Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 54 above.

56.    Even if Arvest did not intend to defraud Plaintiff and the Class, Arvest gained an advantage over Plaintiff by misleading her to her prejudice, and an advantage over the Class by misleading the Class members to the members' prejudice.

57. Arvest has made false, incomplete, or misleading statements to each of its customers by providing its customers with inaccurate balances, causing its customers to overdraw their accounts or initiate transactions for which the account does not have sufficient funds.

58. Arvest has made false, incomplete, or misleading statements to each of its customers regarding the time at which deposits and/or intra-bank account-to-account transfers are authorized and posted causing its customers to overdraw or initiate transactions for which the account does not have sufficient funds.

59. Arvest has made false, incomplete, or misleading statements to each of its customers about Arvest's internal policies and procedures regarding the posting order of transactions and the existence of "batch processing" conducted at 11:59 p.m. on each banking day and on Sundays, on which its customers, including Parrish, detrimentally relied.

60. Arvest has made false, incomplete, or misleading statements to each of its customers through advertisements, informational videos, and other promotional information available to its customers representing that mobile deposits and/or transfers were reliable and that account balances available through mobile banking tools provide accurate and up-to-date information, on which its customers, including Parrish, detrimentally relied.

61. The false, incomplete, and misleading statements made by Arvest to each of its checking account customers constitute constructive fraud, and Plaintiff and the Class

have suffered actual damages as a direct and proximate result of these false, incomplete, and misleading statements.

### Count 3: False Representation/Deceit

62.     Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 61 above.

63.     Arvest made a material misrepresentation and/or concealed or failed to disclose a material fact it had a duty to disclose because of the fiduciary relationship between Arvest on the one hand and Plaintiff, the Class members, and other Arvest customers on the other.  Namely, Arvest failed to disclose the true methods of its electronic banking practices, which are designed to maximize the amount of overdraft fees charged and collected from its customers.  Arvest made material misrepresentations by providing inaccurate account balances in-person and on its online and mobile banking platforms, on which its customers, including Parrish, detrimentally relied.

64.     The representations made by Arvest to its customers in the Agreement and in its promotional and informational materials were, and remain, false and misleading because they do not disclose Arvest's true practices.

65.     Arvest's representations were contrary to its actual practices.  It knew these representations were false, and Arvest intended to create a false impression of the actual facts – Arvest's true banking practices – in the minds of Plaintiff and the other members of the Class, and Arvest was successful in creating such a false impression and in inducing Plaintiff and class members to detrimentally rely thereon.

66.     Arvest made these representations with the intention that they should be relied upon by Plaintiff and the Class.  Arvest intended for Plaintiff and the Class to rely upon the balances it provided when Plaintiff and the Class used their ATM/CheckCards and/or the online and mobile banking systems of Arvest.

67.     Plaintiff and the Class acted in reliance upon Arvest's misrepresentations, and suffered injury – both actual and consequential damages – as a result of their reliance.

68.     Arvest's customers, including Plaintiff and the Class, have been or are likely to be injured as a result of Arvest's deceptive statements about the accuracy of its mobile banking program.

## Count 4: Breach of Fiduciary Duty

69.     Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 68 above.

70.     Special circumstances exist giving rise to a fiduciary relationship between Arvest and Plaintiff and the Class.  Arvest is in a superior position regarding its customers with respect to issues concerning banking transactions and posting processes, as Arvest's customers, including Plaintiff and the Class, are unsophisticated regarding such issues. Arvest owes a fiduciary duty to Plaintiff and the Class, and a fiduciary relationship exists between Arvest and Plaintiff, and between Arvest and the Class, because trust and confidence were placed by Plaintiff and the Class in the integrity and loyalty of Arvest, and Arvest knowingly accepted that trust and confidence and then undertook to act on behalf of the Plaintiff and the Class.

71.     There was, and is, no basis for Arvest to batch and/or reorder transactions initiated and completed by its customers.  There also was, and is, no basis for Arvest to provide inaccurate balances to customers on its mobile and online banking sites.  The only basis for such actions was for Arvest to increase the NSF/OD Fees it could obtain from its customers.

72.     Arvest breached the fiduciary duties it owed to Plaintiff and the Class.

73.     This breach was the direct cause of damages to Plaintiff and the Class. Plaintiff and the Class are entitled to reasonable and fair compensation for the harm directly caused by Arvest.

## Count 5: Breach of Contract

74.     Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 73 above.

75.     When Plaintiff and the Class submitted to the EFT Agreement, contracts were formed between Arvest and Plaintiff, and Arvest and each Class member.  These contracts contain an implied covenant that Arvest will act in good faith toward its customers in performing its contractual obligations.

76.     Arvest agreed, among other things, to provide an accurate and reliable online and mobile banking platform upon which Plaintiff and the Class could rely.

77.     Plaintiff and the Class relied upon the mobile banking platform based upon the EFT Agreement.  Namely, Plaintiff and the Class relied upon their balances represented online and on the mobile applications to be "current" and in real-time, and transferred

money using these platforms with the expectation that they would function as Plaintiff and the Class were promised.

78.     Instead, Arvest breached the contract.  Arvest provided inaccurate balances and did not reflect the transfer of money as it had promised, causing Plaintiff and the Class to overdraw their accounts and suffer actual and consequential damages.

## Count 6: Unjust Enrichment
(Alternatively to Count 5: Breach of Contract)

79.     Plaintiff incorporates by reference all material factual allegations stated in Paragraphs 1 through 78 above.

80.     Plaintiff, on behalf of herself and the members of the Class, pleads the following alternatively to her breach of contract claim.

81.     Arvest knowingly provided banking services to Plaintiff and members of the Class that were unfair, unconscionable, and oppressive.  Arvest made false and misleading statements to Plaintiff and the Class regarding the manner in which it processes and posts transactions.

82.     Arvest knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  Arvest acted with conscious disregard for the rights of Plaintiff and the members of the Class in order to unjustly inflate its own income and derive a benefit to which it is not entitled.

83.     As a result of Arvest's wrongful conduct, it has been unjustly enriched at the expense of and to the detriment of Plaintiff and members of the Class.

84.     Arvest's unjust enrichment resulted directly and proximately from its wrongful conduct alleged herein.

85.     It is inequitable for Arvest to be permitted to retain the benefits it received and is still receiving without justification from the imposition of overdraft fees and other service fees on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner.   Arvest's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

86.     The financial benefits derived by Arvest rightfully belong to Plaintiff and members of the Class.   Arvest should be compelled to disgorge all wrongful and/or inequitable proceeds.

## V.     PRAYER FOR RELIEF

WHEREFORE, because of these unlawful acts, Plaintiff requests that judgment be entered in her favor, and in favor of the Class, against Arvest as follows:

A.     Declaring Arvest's overdraft fee policies and practices to be violative of the Deposit Agreement and any other applicable contracts, wrongful, and unconscionable;

B.     Awarding restitution of all overdraft fees at issue paid to Arvest by Plaintiff and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

C.     In the event judgment is entered in favor of the Plaintiff and the Class on the unjust enrichment claim, compelling disgorgement of the ill-gotten gains derived by Arvest from its misconduct;

D.     Awarding actual damages in an amount according to proof;

E.      Awarding punitive and exemplary damages;

F.      Awarding statutory damages;

G.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H.      Reimbursing all costs and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law and the parties' contract; and

I.      Awarding such other relief as this Court deems just and proper.

Respectfully submitted,

/s Drew Neville
Drew Neville, OBA #6641
William A. Johnson, OBA #4730
Matthew W. Brockman, OBA #22077
Elizabeth A. Price, OBA #22278
HARTZOG, CONGER, CASON & NEVILLE
201 Robert S. Kerr, Suite 1600
Oklahoma City, OK 73102
Telephone: (405) 235-7000
Fax: (405) 996-3403
dneville@hartzoglaw.com
wjohnson@hartzoglaw.com
mbrockman@hartzoglaw.com
eprice@hartzoglaw.com

-and-

/s Kevin E. Krahl
Kevin E. Krahl, OBA # 11126
John A. Krahl, OBA #31124
FULLER, TUBB, BICKFORD & KRAHL, PLLC
201 Robert S. Kerr, Suite 1000
Oklahoma City, OK 73102
Telephone: (405) 235-2575
Fax: (405) 232-8384
krahl@fullertubb.com
jkrahl@fullertubb.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of August, 2015, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants for this case:

| | |
|---|---|
| John A. Kenney, OBA No. 4976 | Gregory C. Cook (*pro hac vice*) |
| Spencer F. Smith, OBA No. 20430 | Adam. K. Israel (*pro hac vice*) |
| MCAFEE & TAFT A PROFESSIONAL CORPORATION | BALCH & BINGHAM LLP |
| Tenth Floor, Two Leadership Square | 1901 Sixth Avenue North |
| 211 N. Robinson | Suite 1500 |
| Oklahoma City, OK 73102 | Birmingham, AL 35203 |
| (405) 235-9621 | (205) 524-8100 |
| john.kenney@mcafeetaft.com | gcook@balch.com |
| spencer.smith@mcafeetaft.com | aisrael@balch.com |

**ATTORNEYS FOR DEFENDANT**

/s Drew Neville
Drew Neville